The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. We have one case on for argument before this panel, 25-1189, National Association of Diversity Officers in Higher Education v. Trump. Mr. Roth. May it please the Court, Yakov Roth on behalf of defendants. Your Honors, the panel in this case at the stay stage concluded that the government was likely to prevail on the merits. We think that prediction was correct, and so we now ask the Court to reverse the preliminary injunction. There are three provisions of the executive orders that are at issue in this case. I'd like to address them one at a time, because although there are some common themes, the reasons why the challenges fail are slightly different from one to the next. And I'd start with what we call the report provision, because I think that's the one where the justiciability issues are the most severe. That's the provision that directs the Attorney General to prepare a report for the President on recommendations for enforcing the civil rights laws. And we don't think there's standing for plaintiffs to challenge that provision, because it just calls for the preparation of a report. There's no ripe controversy if there's simply a series of recommendations that may be made to the President. Can I ask about that report? My recollection is that there was a deadline attached to the report, right, which is, I think, if my math is right, long come and gone. So what is the status of the report? Your Honor, I asked the same question, and I learned that the report was in fact provided to the President back in June, which raises another question of justiciability concern, which is what is the injunction going to redress at this point? There is a report. It was provided. It's done. So I'm not really sure what is left. I thought the district court specifically said, I'm not enjoining that part. I'm enjoining the enforcement actions that would come after. Right. So the district court said it was not enjoining preparation of the report. I mean, we had a stay, so regardless, the report was provided. I'm not really sure what the other part of the injunction was intended to do, because, just candidly, the enforcement actions that are contemplated are not under the EO. I mean, the enforcement actions that are discussed in the report are under the civil rights laws, and so it's not clear to me what force the court thought that injunction was going to have, but to the extent it has any force, I don't know what the standing would be to challenge it. We don't know what these enforcement actions are, who they would be against, what the subject matter would be, what the underlying conduct is. So it's very hard for me to see how there could be a ripe controversy at this point with respect to that provision. The next one is the termination provision, which is about the grants, and that's the provision that directs the agencies to terminate, to the maximum extent allowed by law, all equity-related grants or contracts. And the plaintiffs say that that's vague, equity-related. It's sort of hard to know exactly what that means, and I think if this was a provision that purported to prohibit equity-related activities, they would have a pretty good argument that that is too vague. If this was a criminal statute or even a civil statute that prohibited something, people are entitled to notice what that means. The problem is, in this context, there is not a constitutional right to that sort of clarity, and that's because this executive order is not defining what is lawful or unlawful. It is determining what the government is going to pay for or not pay for. And in the funding context, the Supreme Court has said in Finley, we don't have the same concerns under the Due Process Clause with vagueness. That might be, I think that might be right. Finley had to, what was it, like decency, a very nebulous standard. I had a sort of preliminary question before that, because Finley was Congress making a law telling the National Endowment for the Arts what standard it should apply. But this executive order is the President telling his subordinates within the executive branch what standard to apply. So why is, why are vagueness principles implicated at all? Why is Due Process Clause implicated when it's not regulating private parties and we don't have one branch giving a standard to another branch? Right. So, Your Honor, I was going to say this. There's two levels of problems. Yeah. So the first level problem is sort of generally funding doesn't present the same types of concerns. The second level problem is that this instruction, as Your Honor says, was not, this is not the regulation. This is the President directing agencies how to exercise their preexisting authorities. And so I think it's important to look at what are those preexisting authorities. And in particular, there's a regulation that's cited in the briefs that generally applies to government grants, which says agencies can terminate them if the grants are no longer effectuating agency priorities. And of course that standard is much more vague than equity related. That is very broad and discretionary and subjective. And yet nobody has ever suggested to my knowledge that that regulation presents a vagueness concern. I think all the more so when the President is simply instructing agencies on how to execute that broad authority. He's basically telling them when you're applying that, you should know equity is not a priority of this administration. Take that into account. That, if anything, narrows the agency's authority in this space. Can I ask you a question about how this provision, I mean I don't know how it was contemplated it would be enforced, I guess, since this is just a facial challenge. I had assumed that when it says agencies should terminate equity related grants, it meant that the grant itself would be equity related, like we gave you this money to study women in STEM. And the agency would look at the grant documents, solicitation, the narrative, and make a decision based on that. Is that roughly how it works? That's my understanding of how it was intended to work. And I know there's some discussion in the briefs about how some agencies might have done something different. So just say I have a grant to, I'm trying to think of the least equity related thing I can think of, clearly not equity related, studying fertilizers for avocado plants. Am I pretty much in the clear or do I have to worry that if one of my employees puts her pronouns on an email, like all of a sudden I'm going to lose my grant? That's not how I understand this provision, Your Honor. I understand the provision to be look at the grants, look at the, there's usually a grant document and an application and then an approval. I mean I've seen a bunch of cases like this now, so I've seen them. And the agencies are supposed to look at them and figure out, oh, this one's not in conformance with current administration priorities. And so if the law allows termination, you should go ahead and terminate it. And it's, I don't think in that context there's a viable Fifth Amendment vagueness challenge to be made. One of the hypotheticals I was thinking about in preparing for this argument was, imagine the president had called up a cabinet secretary and said, I really think we shouldn't be doing research into whatever, X or Y. You should cancel those grants if you can. I don't think we would say that's an egregious Fifth Amendment problem because it was secret. It was not public. That's worse than being vague. People don't even know, don't know it at all. But we wouldn't have that reaction to that instruction because we understand it's not changing the authorities that the agencies have. And there's nothing that the regulated parties really need to know. This is all a question of what the government is determining to pay for or not pay for. And that just is different from the Fifth Amendment concerns that arise in the cases that plaintiffs rely on. No further questions on termination. I'll address the certification provision, which is the one that instructs the agencies to include in contracts a term whereby the grantee or contractor certifies that it does not operate any programs promoting DEI that violate any laws. I think the first problem that I have with this claim is plaintiffs actually allege in their complaint that they already certify that they are in compliance with all federal civil rights laws. That's page JA-47, paragraph 118 of the complaint. And so from just an Article III standpoint, I'm not sure why this additional term makes any tangible difference to them. It is simply... Well, I think it's because they read this term as requiring that they certify that they don't do anything that promotes DEI. And I know you disagree. And on the merits, they may be incorrect. But for standing purposes, we assume they're right on the merits, don't we? Well, I don't think we look past the text of the thing they're challenging. We have to determine whether there's an objectively reasonable fear. I feel like we maybe would screen for plausible the way we do for everything. But if there is even a plausible case that it means what they think it means, then I think we don't have a standing problem. Okay. Well, look, we can... I think these bleed into each other really. Yeah, I don't have a strong view on which way is the right way to look at it. They really do sort of bleed into each other a lot. But for First Amendment chilling, I thought we do have a standard for that, right? It can't just be plausible that somebody could read this the wrong way and be chilled. It has to be objectively reasonable that the law itself would chill legal conduct. That's right. So for First Amendment to sort of chill as an injury, all the court's cases say it's got to be an objectively reasonable fear. It can't be just a subjective fear, a subjective chill. So go ahead. I'm sorry. No, I think when you read this in both on its face and in context, I don't think there's any doubt that it is saying we are concerned about illegal things, unlawful discrimination, and basically we don't care whether you attach the label... And it's not like nebulous, like unlawful in the eye of the beholder. It says what laws we're concerned about, right? Any applicable federal anti-discrimination laws. Those laws have already been on the books for a while. Yeah? Correct. And there is no challenge to those laws in this case. But the flip side of that is that precisely because these laws have already been on the books, what work is this certification provision doing other than, say, the plaintiffs chilling their speech rights? So I think what it's... Do sometimes presidents do things just for show? Just to say, follow all the laws, even though people already have to follow the laws? I do think it's belt and suspenders, but I do think there is one additional feature of it that's important, although not only it helps them, which is I think there's this... The idea behind the additional certification, even though it is repetitive of the ones they're already making, is to make clear that the administration does not view the label DEI as somehow immunizing conduct that would otherwise be unlawful. And that may have been a view that people had in the past, that certain types of discrimination may be exempt. And I think what this is designed to do is say, to the extent there's going to be some false claims act proceeding sometime in the future against somebody, we don't want you to come back and say, oh, we didn't think DEI could be subject to Title VII. We thought that was off limits. We're making it very clear that's not a categorical exclusion. Of course the label doesn't make it unlawful, but the label also doesn't make it lawful if it would otherwise violate the civil rights laws. And nothing in the executive order purports to change in any way the scope of those civil rights laws. And I think that's ultimately dispositive, because if there is some... So label or not, your position is that there could be programs, likely are programs, I would hope, that may be labeled as DEI that fall comfortably within the parameters of the law. Absolutely. Can you give me an example? Well, there are all sorts of training programs, for example, Your Honor, that may be diversity training that people may do for employees. Now, I think there are parts of the executive order that say, within the government, we're not going to do that anymore. But that's different from saying in the private sphere that it's prohibited. I don't see in an ordinary case how that would be prohibited. Can I ask you a question just to kind of get... I'm just interested in what your response would be. As I read the district court... I feel like the district court was really struggling with this idea that when you take these orders together, the three provisions, the introductory language, I felt like the district court thought that the practical effect would be to chill a lot of DEI-related speech and even legal DEI activities, that it was just sort of an announcement like, you know, we're pushing as hard as we can on this stuff, so you better be very, very careful and maybe err on the side of caution in what you say and what you do. And the thing I'm interested in is whether you think that is wrong, that wouldn't be the effect, or you think it is right, and that is the whole point, and there is nothing wrong with that. This is the president using his bully pulpit and telling everybody. I don't take a very narrow view of what counts as legal DEI, and you should assess your exposure and your conduct accordingly. So I don't think it's a fair reading of the executive orders together. I think when you read them together... I mean, the second one, the one we're talking about now, is titled Ending Illegal Discrimination and Restoring Merit-Based Opportunity. So there is broader language in parts of the order, including the termination provision, right? It talks about equity-related. It doesn't say illegal equity-related. But that's because that part of the order is talking about what the government is doing internally or with its own money. I think if you read the orders carefully, that dichotomy does come across, and so I don't think there's a reasonable basis for people to say, oh no, the government's going to come after anything labeled DEI and say it's illegal. I don't think there's any basis on the face of this, and I don't think there's been any basis since for anyone to draw that conclusion. I do think the orders are intended to say we don't view it as a blanket defense, the way it may have been viewed in the past before some Supreme Court decisions and so on, that we think these activities and programs are subject to the civil rights laws, and so people should take that seriously as they take any conduct that may violate the civil rights laws. But I don't think there's a fair reading of the orders that would suggest that the government is going to change its position on the scope of those laws or apply it in a way that is improper. And of course, if some enforcement action did come up where the government was asserting a wrong position on the scope of the civil rights laws, the target of that can defend on that ground, can move to quash the subpoena, can do lots of things to raise that concern. It's just that on the face of these orders, I don't know how any of that is properly ripe or before the court. All right. Thank you, Mr. Roth. Thank you very much. Ms. Cataccio? Thank you, Your Honor. I think that's all I have to say. I think that's all I have to say. Thank you, Your Honors. And may it please the Court. I'll start. On behalf of plaintiffs at Peliz. When read in context, as Judge Harris was just suggesting, the stated purpose or the stated the effect of these executive orders that label ideas, diversity, equity, and inclusion as dangerous, demeaning, even immoral, is to chill speech. And that's what happened to our plaintiffs here. They had to certify across agencies that they do not promote DEI and several of their grants and contracts were either paused or terminated based on these executive orders. To remedy the irreparable harm to plaintiffs, the District Court correctly entered a preliminary injunction as to the three provisions that counsel just discussed. And I will start with the First Amendment claim as to the certification provision. Can I ask you a broader question about the posture of this case? This is a facial challenge to these orders and you talked about the sort of the intended effect and you're arguing about the atmospherics and beyond the text of the orders. Are we allowed to consider that or we simply look at the text of the orders and decide whether or not, as a matter of a facial challenge, whether you've made out a claim? Your Honor, you should and you are allowed to consider the full context, which means the language of the purpose of the executive orders as written in the plain text, but also like how the government has enforced. And the case I'm thinking of that we cited to is Forsyth, where the government's own interpretations and official statements about what these executive orders mean and what they're intended to do are relevant. So it is relevant here that the Department of Justice in a memorandum from February 5th stated things like unconscious bias training or cultural sensitivity training, going to training programs, that that's somehow not permitted. Was that internal to the government or across both internal and external? That memo was public and external, Your Honor. Oh, as in like who are they instructing? That specific memorandum was directed to DOJ components or subordinates and it was saying, please pay close attention to references such as cultural sensitivity. Okay, but that's not your clients, right? Mr. Rolf says that that wasn't directed at your clients? No, Your Honor, but it does help to explain the chilling effect as to why our clients reasonably believe that these executive orders extend beyond unlawful conduct and start to creep into deterring ideas and concepts here. And it's not just that DOJ memorandum. It's also actions taken by specific agencies. So at SA, our supplemental appendix, page 69, there's an example of FCC investigating a company merely because it had a DEI statement on its website and had a DEI infrastructure, which means hiring diversity professionals or hosting trainings and things of the like. It's impossible for our clients not to ignore that context. If this executive order comes out, a couple of weeks later, you have major agencies taking actions based on the executive orders that extend beyond unlawful conduct. And there are other examples in the record too of agencies saying, cease all DEIA activities. So I point your honors to- I suppose Mr. Rolf would say that the fact that some rogue agency or some rogue employee has taken an overly aggressive view of these directives and executive orders doesn't mean that as a matter of a facial challenge that that's enough to overcome the text of the orders. Your Honor, it would be one thing if it was just limited to a single agency or a rogue employee, but these are statements put out by agency heads or agencies as a whole, and it's across multiple agencies. So it's a little hard to say that these are outlier examples or somehow rogue actors, as opposed to reasonable interpretations of what agencies were expected to do under these executive orders. So we've highlighted examples in our briefing from CDC, the Department of Labor, and of course, the amicus briefs that were filed in this case show plenty of examples stretching across multiple federal agencies that suggest this is- agencies interpreted these orders to mean something other than just follow the law or the existing law. Have there been challenges to those particular agency orders? Someone saying, you know, cease all DEI. That seems like that would be a different challenge, right? I understand the point you're making that we should feed that into the way we think about how to interpret the orders in front of us, but I'm just asking apart from that, have there been challenges to those particular agency orders? I don't believe so as to these specific ones that I just referenced, Your Honor, but there are challenges, ongoing challenges to specific terminations and certifications that were announced after the state was entered in this case, if that answers your question. I'd like to go back to the certification provision, and our primary argument is that it discriminates- it's not content neutral, and that's where the analysis has to start under Reed v. Town of Gilbert. It's fundamentally, does the certification provision treat people differently based on its message? So if you are on the- if you are- if you promote DEI or have programs promoting DEI, you are subject to actions under the certification provision. If you do not and you're on the opposite side of the spectrum or even oppose DEI, you don't face any consequences which- from the certification provision, and the consequences are severe. It's FCA enforcement with trouble damages- I'm sorry, can you explain that to me again? Yes, Your Honor. So the certification provision says certify that compliance with federal anti-discrimination laws is material to the government- Correct, Your Honor. And certify that you don't operate any programs promoting DEI that violate federal anti-discrimination laws. And so you're saying what viewpoint is exempt from the law under your theory? I'm saying on its face, Your Honor, that people or groups who promote DEI through their programs are targeted, but someone who opposes DEI would not face any consequences from the certification provision. So are you in reading this to mean that people who- or programs that oppose DEI are exempted from the federal anti-discrimination laws? Not from the federal anti-discrimination laws, but this specific provision, Your Honor. But this provision, all it does is enforce federal anti-discrimination laws, right? I'm just reading it. Well, that's- it does refer to whether the program violates federal anti-discrimination laws, but it is putting a thumb on the scale of those who promote DEI face an additional consequence here. What is their additional consequence above and beyond federal anti-discrimination laws? Well, they're also certifying to materiality, which is a significant factor in any FCA case. So that is something they are giving up. Everybody has to do that, though, right? I don't see anything in the- where you certify to materiality only as to DEI. Everyone has to agree that complying with this country's federal anti-discrimination laws is material to the government. Everyone certifies as to materiality, but then I think the second piece focuses on people promoting DEI. Like, it is putting a weight on- a thumb on the scale as to which ideas should be targeted versus not. And I think the case that kind of sets up this- a similar case is the city versus the city of St. Paul, which is discussed in Finley. And there, it- there the government was also purporting to regulate fighting words. But it wasn't just- and that's- that would be illegal, but it specifically targeted fighting words only if those words were related to race, religion, and other protected characteristics. So there the court said that is- that is a form of content-based discrimination that violates the First Amendment. So if this provision said we are only going to pursue cases enforcing the federal anti-discrimination laws against DEI programs, or if, you know, that's going to be our top priority, right? That might be different, but it's- it's not what it says, right? Not on its face, Your Honor, but the government has made statements to back up that they are targeting DEI or programs specifically going after and prioritizing DEI programs- Does the existence of these federal anti-discrimination laws chill your client's speech? The existence of just generally federal anti-discrimination laws? No, Your Honor. It does not by itself. That alone has never- So how does this- the- this provision that says you must certify you're not violating federal anti-discrimination laws, how does that chill their speech? Your Honor, respectfully, I don't- I think the difference there- that's not what this- that's not what this provision says. I think if it said you must follow anti-discrimination laws, we wouldn't be here- You must follow anti-discrimination laws in this, in that, in X, in Y, in DEI, in all- all of your operations. Your Honor, I think the inclusion of promoting DEI here is the issue. If it said simply you must follow the law, follow anti-discrimination laws, our clients already do that, and as Mr. Roth mentioned, then there's- there are assurances of compliance for pretty much every federal grant or contract. So this- I'm not sure what this adds, and it goes to- this actually speaks to- I guess that says two things. I'm not sure what it adds in terms of obligation, and I'm not sure what it adds in terms of injury, right? If it's the same, then it adds nothing either way. Well, I think that's what Mr. Roth was saying, but for us, we read this provision to specifically target promoting DEI, and we've seen examples of the government going beyond what most people would consider unlawful conduct, and targeting things like websites, or the existence of certain training materials. So I don't think it's just limited to illegal conduct, Your Honor. And what I was trying to say was- Well, you know, this is kind of tricky to sort out, right? Because you're asking us to look at, like, examples from different agencies, and different employees, and, like, what they may do, totally unrelated to the certification provision. But that's why we have a standing requirement. So we don't have to come up with hypotheticals and draw inferences from things that are unrelated. But instead, we require an actual injury in a particular instance, and then we can litigate and look at that injury, and who caused it, to whom, and is it redressable? You know, that gives us a concrete case. And so that's why we have this standing requirement, so that we're not mired in the sort of hypothetical atmospherics discussion we're having now. Your Honor, I don't- Well, one, I would say it is related, because the examples we've cited are examples of enforcement of these executive orders, and how the government interprets illegal DEI. So it's not completely unrelated. And the question as to standing is, would a reasonable person, seeing these orders, and seeing the enforcement, and what the government is saying in communications to them, and more broadly, as they take enforcement action- But what are we in joint, like, would we then be, like, the executive order itself doesn't say any of this, right? But maybe a bad interpretation of it would say that. So like, we would enjoin maybe the FCC from taking a wrong interpretation. But that's not at all the case in front of us. You see what I'm saying? It's, the government is a big entity. I understand what you're saying about the government being a large entity, Your Honor. But I think the injunction, what would be enjoined, would be including this certification in future grants or contracts, because there is a great risk of chilling speech here. That's the practical effect of an injunction. So then all these other things could continue. The FCC could do what it's doing. The other agencies can keep pursuing their current policies. But your clients would no longer feel a chill if we, if this certification provision didn't exist. It's not that our clients wouldn't feel any chill at all. But this case is about these three directives and curing the harm from these specific directives. Of course, like, it's not intended to resolve all chilling effect created by the administration's anti-DEI or anti-equity priorities. And I don't think that's required for standing that this case must solve all their chilling. It's just the chilling from these three specific directives that the president has issued. That's what I would say there. I'd like to turn to the termination provision. The termination provision on its face is unconstitutionally vague. It has no standards. And the key concern is, really, agencies have unfettered discretion to target protected expression. And how they've carried out this termination piece really illustrates, really illustrates the First Amendment implications. When you say that, I mean, I think Mr. Roth would say they have discretion to not subsidize certain speech. They don't need to, the government doesn't need to fund speech that it might disagree with. That, that, that's, if you're referring to like Rust and the cases where Congress decides, has decided, we don't want to fund this particular You can say whatever you want. You can say whatever you want. Your clients can say whatever they want, but the government doesn't need to subsidize that. I agree generally with that principle, Your Honor, but I don't think that solves the vagueness issue here. The issue is the way that this, there's nothing in the text of these, the provision, provision that prevents grantees, that prevents any agency from going after grantees or contractors just for their speech. It's not, it's not just a matter of, okay, we're only going to terminate the ones that are clearly labeled diversity or equity. What they've done is like word searches for... Word searches of what? Of like the grant materials? Correct. I can give you a concrete example with Baltimore at SA 63 to 65. Baltimore receives three grants from AmeriCorps and they are for volunteer services and for senior citizens. So on its face, nothing to do with equity. Their grants were flagged for noncompliance because they used, and the materials were grant applications, the statement, a narrative statement about what they intended to do with the grant and other priorities that they, other things they may have listed. It's not, I don't think it's limited to just the application. There may be other documents attached, but those word searches were for things like diversity, DEI, anything related. I guess I don't see why that is a vagueness problem then because, I mean, you worry about two things with vagueness and one is notice to the person, but it's not like if only you knew that this was going to count as equity related, you would take the money and use it for something else because you're not allowed to do that. You got a grant to do the thing you said you would do in the narrative, not you. Your client said it would do in the narrative. So there's, you're not allowed to conform your conduct. You have to keep doing what they gave you the money to do. So I think the notice problem kind of falls out and then on the too much discretion and enforcement, I mean, I think you really do have kind of a Rust-Finley problem, which is that the government's not allowed to exercise a lot of discretion based on subjective criteria about what speech it wants to pay for. Your Honor, but even Finley says you can't use a grant program or a subsidy to go after an idea just because it's dangerous. I think Finley is distinguishable for two reasons. The type or the nature of the directive in Finley was entirely different. It was you can take decency and respect into consideration. It's just a factor. There's a lot of flexibility there as to how they ultimately or how the NEA ultimately awards those artistic grants. Here it's categorical. Anything that an agency thinks is equity related, whether tied to something they have said, like we promote equity in hiring or whether it's actually connected to the grant itself, the nature of the grant, the directive here is terminate those. You decide. You have unfettered discretion to decide what that means here. It's standardless and there's no flexibility unlike Finley. It feels sort of like I struggle with your case a little bit because if you step back a little and kind of look at everything that's going on, on the one hand, there's not enough notice. You don't know what counts as equity related, but a lot of your argument is more like we're getting too much notice. Every time they tell us we're coming after you, we're coming after you, they're chilling more speech. I feel like some tension in your argument. I'm sure there are ways of sorting it out, but do you see my, I guess it's a question. Do you have any response? I don't think, well, at least from our client's perspective, I don't know that they would say there's too much notice here. It's a lot of things were happening soon after the, a were issued and it was arbitrary. There weren't good reasons for, okay, why is a tree, a tree equity grant getting cut? Why is a senior program getting cut? And how, how, what do we do to ensure that we're not being targeted or that our grants and contracts aren't being targeted simply for using certain words or expressing certain ideas? So I don't know that our clients. You're not bringing a first amendment claim on the termination provision, right? Just a fifth amendment claim. That's correct, your honor. Okay. You've been using a lot of first amemony sort of language and I want to just clarify. That's true, but as the district court recognized, you can have first or you can have chilling effect caused by vague or unconstitutionally vague terms. So that is part of the harm in terms of- I think Judge Harris makes a good point though, that it's the, there's not really a notice problem here cause there's, there's nothing a grantee can do, right? They can't, they can't change their conduct to conform to the executive order. You've got, you've got a grant to do something and it's kind of a fait accompli whether you're on the chopping block or not, right? I don't, not, not necessarily, your honor. And I go back to that AmeriCorps example. Once their grants were flagged, once Baltimore's AmeriCorps grants were flagged, they were given three options. It's either certify you're not promoting DEI using these grants or conform or I don't remember the exact words, but it says something along the lines, you can conform your conduct or change things to comply without any indication of what that means. Does it mean you resubmit your application to strike out certain words? So there is an element. Maybe that's vague. Maybe the CDC's letter to Baltimore is vague and that would be a nice concrete case to bring and challenge that particular instruction to the grantee for vagueness. Your honor, but I see I'm shorter on time. Can I, let me answer. Thank you. It is true that you could probably bring in a more as applied challenge, but I think the source of the harm goes back to, and why there's arbitrary enforcement is the directive itself and the termination provision is, is completely standard list. The harm derives from the executive order and that piecemeal approach is, we're not required to take that piecemeal approach here. Um, I genuinely can't remember. You don't, is there an APA claim arbitrary and capricious in this case? I think not. I know your honor, it's both constitutional claims. Thank you very much. Thank you, your honors. So I'll just make, uh, I think two observations about a couple of cross cutting, uh, problems with, um, the plaintiff's case here. The first is sort of misreading the orders and the second is the facial as applied issue. So on misreading the orders and the council said, oh, the order say that DEI is dangerous and demeaning and immoral. That's not what it says. It says that certain entities have adopted and actively use dangerous, demeaning and immoral race and sex based preferences under the guise of so-called DEI, which is sort of our point I was trying to make before. It's not about the label. It's about whether the underlying conduct is unlawful discrimination. And I think once you understand the orders properly that way, a lot of the concerns fall away. Second, with respect to facial and as applied, they did bring this as a facial challenge and then we hear a lot of, well, but this agency did that and that agency did this. So there's a couple of points on that, um, that I think illustrate why courts distinguish the two. So council mentioned something about DOL and I think DOL had some sort of stop work order that they say was not compliant. Uh, my understanding is DOL rescinded it. Okay. So if we had a case about that, it would become moot because they rescinded that. They talked about an FCC investigation that they say was on, you know, the first amendment retaliation. FCC is not a defendant in this case. I have no idea what the FCC was doing because they're not here. I don't represent them. Same thing with AmeriCorps. AmeriCorps is not a defendant in this case. There are cases against AmeriCorps, um, where their actions have been challenged. That's a, I think that's a good point. But we also have to acknowledge that the injunction binds people who aren't your clients, right? That's another problem with the injunction. The entire government. Yes. Yes. Um, On behalf of non plaintiffs, it binds non defendants. It's the only one I've seen like this, Your Honor. I've seen a lot of injunctions the last few months. I've not seen an injunction that operates that way, which is, uh, is concerning. But I think given that the injunction fails for other reasons, I'm not sure how much we need to say about it. You know, the examples you gave and, uh, your colleague on the other side, I assume, well, in fact pointed to others, there may be others in the record. And the point I suppose is that these orders or the texts of the, uh, you know, the executive orders seem to give license to agencies and individuals to act in a way inconsistent with the law in a way that maybe wasn't encouraged before. That seems to be the argument as to why a facial challenge is appropriate. So I'm just not seeing how that's true though from the text. I mean, the termination one is the one where we see, I think the most examples that are being raised. Um, and the termination provision says, do it to the extent you're allowed by law. Now is every agent I can't represent. No agency has made a mistake doing it. I don't know. But if they do, there can be challenges to that and there have been challenges to that. So we do have as applied challenges to grant terminations that have been brought across the country, some of which have succeeded. So, you know, they cite, I think they cite the Chicago women in trades case from the Northern District of Illinois where the court concluded that a particular grant from DOL could not be terminated based on this executive order because the statute itself sort of required equity to be taken into consideration and reinstated it. That's an example of a successful as applied challenge to application of the termination provision, but that's not what we have in this case. I think that that is fatal for this challenge. There are no further questions we'd ask the court to reverse. All right. Thank you, Mr. Roth. Thank you. I want to thank both counsel for their fine arguments. This is still morning. Ms. Gattaccio, I see on my sheet here that you took this case on pro bono and we're grateful. I'm sure your client is grateful, but we are grateful for your fine advocacy here this morning. We appreciate your doing that and the finest traditions of this court. And Mr. Roth, thank you for your able arguments as well. We'll come down and greet you and then adjourn for the day, I think, this time. This honorable court stands adjourned until tomorrow morning. God save the United States and the honorable court.
judges: Albert Diaz, Pamela A. Harris, Allison J. Rushing